******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# LOCH VIEW, LLC *v.* TOWN OF WINDHAM
## (AC 47414)

Elgo, Moll and Suarez, Js.

*Syllabus*

Pursuant to statute ((Rev. to 2009) § 12-65b), a municipality may enter into an agreement with a property owner to fix the assessment of real property for a set period of time, permitting the development of such property without the increased taxes that might otherwise result from such improvement, provided the cost of improvements to the property is not less than $3 million.

The defendant town appealed and the plaintiff property owner cross appealed from the trial court's judgment holding that the plaintiff had breached the tax fixing agreement that the parties had entered into pursuant to § 12-65b by failing to meet the final of three financial benchmarks set forth therein and that the town had breached the agreement by exceeding the scope of its contractual remedy. The town claimed, inter alia, that the court improperly relied on capital expenditures incurred by the plaintiff prior to the execution of the agreement in determining that the plaintiff met the first two financial benchmarks, and the plaintiff claimed that the court improperly rejected its appeal pursuant to statute (§ 12-119) from the town's valuation of the subject property on the 2014 grand list. *Held*:

The trial court properly considered amounts that the plaintiff had spent on capital improvements prior to the execution of the agreement in determining that the plaintiff had met the agreement's first two financial benchmarks, as the court found that the parties' purpose in creating the agreement was to incentivize the plaintiff to invest $3 million in the subject property by a set date and that the purpose of the benchmarks was to ensure that the plaintiff was progressing toward that goal.

The trial court properly concluded that the limitation of remedies provision in the agreement permitted the town to assess the property retroactively only for the final year covered by the agreement and such construction of the agreement did not run counter to the requirements of § 12-65b, as the scope of the statute is limited on its face to establishing the necessary prerequisites in order for a town to be granted authority to enter into such an agreement and does not address the consequences of a breach of that agreement.

The trial court's finding that the town waived its right to enforce the reporting requirement of the agreement was not clearly erroneous, as the court relied on the town's repeated failure to enforce that provision throughout the term of the agreement.

The trial court did not abuse its discretion in admitting into evidence one of the plaintiff's exhibits under the business records exception to the hearsay rule, as the court determined that the plaintiff established that the documents in the exhibit, which consisted of 1327 pages of records documenting the plaintiff's claimed capital expenditures on the property, constituted business records, the plaintiff having presented sufficient evidence to demonstrate that the witness who authenticated the records had the requisite knowledge to attest to the status of the records in that exhibit.

The town's claim that the admission of the 1327 page exhibit unfairly prejudiced it was unavailing, as the record revealed that the trial court took appropriate measures to mitigate any prejudice experienced by the town by requiring the plaintiff to Bates-stamp the pages of that exhibit and to incorporate references to the Bates-stamp numbers in another exhibit that summarized the 1327 page exhibit.

Pursuant to the Connecticut Code of Evidence (§ 10-5), the plaintiff provided the town with a copy of the 1327 page exhibit and of its summary sufficiently prior to trial.

The trial court did not err in failing to award the town interest on the plaintiff's delinquent taxes for the 2015 tax year, as the town abandoned its claim for interest by withdrawing its counterclaim seeking interest prior to trial and raising the issue only in a motion for reargument after the court had rendered judgment.

The trial court properly rejected the plaintiff's appeal of the town's reassessment of its property for the October 1, 2014 grand list year pursuant to § 12-119, as the plaintiff had demonstrated only that the town overvalued the property, a showing that the court properly concluded was insufficient to satisfy its burden to prove a wrongful assessment pursuant to § 12-119.

Argued April 30, 2025—officially released February 3, 2026

*Procedural History*

Action, inter alia, appealing a decision by the defendant's board of assessment appeals denying the plaintiff's appeal, without a hearing, as to the valuation of certain real property, and for other relief, brought to the Superior Court in the judicial district of Windham and transferred to the judicial district of New Britain, where the defendant filed a counterclaim; thereafter, the case was transferred to the judicial district of Hartford, where the defendant withdrew its counterclaim; subsequently, the case was tried to the court, *Farley, J.*; judgment in part for the defendant; thereafter, the plaintiff filed an

amended complaint, and the defendant appealed and the plaintiff cross appealed to this court. *Affirmed.*

*Kyle J. Zrenda*, with whom was *Marjorie Richardson*, for the appellant-cross appellee (defendant).

*Richard P. Weinstein*, with whom, on the brief, was *Sarah Black Ligenheld*, for the appellee-cross appellant (plaintiff).

*Opinion*

MOLL, J. General Statutes (Rev. to 2009) § 12-65b authorized a municipality to enter into an agreement with a property owner to fix the tax assessment of real property, including any improvements made thereon or therein, for a set period of time.[1] Such agreement permits the development of the subject real property without the increased taxes that may otherwise result from the improvements. The present case arises from the redevelopment of real property, known as Windham Mills, which was the subject of such a tax assessment agreement (agreement) between the plaintiff, Loch View, LLC, and the defendant, the town of Windham (town), by which the town provided the plaintiff a fixed assessment rate for the property for seven consecutive grand list years in exchange for the plaintiff's promise to expend at least $3 million on capital improvements to the property in accordance with a timeline set by the agreement. In the underlying action, the plaintiff sued the town, claiming that the town breached the agreement by cancelling it after its term had expired and challenging the town's

---

[1] General Statutes (Rev. to 2009) § 12-65b provides in relevant part: "(a) Any municipality may, by affirmative vote of its legislative body, enter into a written agreement with any party owning or proposing to acquire an interest in real property in such municipality . . . fixing the assessment of the real property . . . which is the subject of the agreement, and all improvements thereon or therein and to be constructed thereon or therein . . . (1) for a period of not more than seven years, provided the cost of such improvements to be constructed is not less than three million dollars . . . ."

All subsequent references to § 12-65b in this opinion are to the 2009 revision of the statute.

reassessments of the property for the years covered by the agreement, as well as the town's assessments of the property for multiple years after the term of the agreement had ended. The town counterclaimed that the plaintiff had breached the agreement by failing to meet the plaintiff's reporting and capital expenditure obligations. The town appeals and the plaintiff cross appeals from the judgment of the trial court, which held, inter alia, that the plaintiff breached the agreement by failing to meet the final of three financial benchmarks set forth therein, and that, although the plaintiff's breach entitled the town to rescind some of the plaintiff's tax benefits pursuant to the agreement after its term had ended, the town also breached the agreement by exceeding the scope of its available contractual remedy.

In its appeal, the town claims that the trial court improperly **(1)** relied on capital expenditures incurred by the plaintiff prior to the execution of the agreement in determining that the plaintiff met the agreement's first financial benchmark; **(2)** concluded that the limitation of remedies provision in the agreement permits the town to assess retroactively the property only for the final year covered by the agreement; **(3)** found that the town waived enforcement of the reporting requirements set forth in paragraph 15 of the agreement; **(4)** admitted into evidence two exhibits proffered by the plaintiff: a voluminous collection of records documenting the plaintiff's claimed capital expenditures on the property, and a document summarizing those records; and **(5)** failed to award the town interest for the 2015 tax year. In its cross appeal, the plaintiff claims that the trial court improperly rejected its appeal, pursuant to General Statutes § 12-119, from the town's valuation of the subject property on the 2014 grand list. We affirm the judgment of the trial court.

The trial court found the following relevant facts. "The Windham Mills property includes several nineteenth century mill buildings located on multiple parcels of land, once the home of the American Thread Company,

which left the site in 1985. The plaintiff's property consists of several of those parcels located on either side of the Willimantic River, but only two are recognized as assessor's parcels, 322 Main Street and 322A Main Street. The mill buildings [at 322 Main Street] are all located on the north side of the river. 322A Main Street is a landlocked and unimproved parcel on the south side of the river connected to the north side by an unusable pedestrian bridge. The plaintiff has a parking easement on 322A Main Street but is not the fee simple owner. Following substantial environmental remediation and capital improvements at 322 Main Street, funded by grants and public financing and performed under the auspices of the Windham Mills Development Corporation, the plaintiff, on December 5, 2008, purchased 322 Main Street and acquired the parking easement on 322A Main Street for $5.5 million.

"One month prior to the closing on the plaintiff's purchase of the property, in anticipation of that purchase, the Windham Board of Selectmen adopted a resolution approving the 'general terms and conditions' of a tax fixing agreement it agreed to consummate with the plaintiff following the purchase of the property. The plaintiff and the [town] negotiated the particular terms of the agreement after the closing, and the agreement was finally executed on July 2, 2009. The agreement fixed the assessed value on the 'real property located at 322 Main Steet' at $3,563,760 for seven consecutive grand list periods commencing on October 1, 2008. In exchange, the plaintiff promised to 'cause capital improvements to be made to the [p]roperty' in a 'cost amount' totaling $3 million. The agreement established three benchmark 'cost amount' requirements to be met during the term of the agreement: $900,000 by September 30, 2011; $1.5 million by September 30, 2013; and $3 million by March 30, 2015.

"On November 5, 2015, one month after the first assessment date outside the term of the agreement, an attorney for the [town] wrote to the plaintiff seeking 'an

accounting of the expenditures that satisfy' the capital improvement requirements under the agreement. The letter sought 'such invoices, supply and material contracts, and other tangible and documentary evidence that supports the required cost expenditures.' No requests for information regarding those expenditures had been made prior to November 5, 2015. The plaintiff responded, through counsel, with a spreadsheet summarizing by category the plaintiff's claimed capital expenditures in amounts satisfying the benchmarks and just exceeding the overall $3 million commitment. No backup documentation was provided. . . .

"In January, 2016 . . . representatives of the [town] visited the property for the purpose of determining what improvements had been made. No such inspections had taken place during the term of the agreement and the January, 2016 inspection itself left out substantial portions of the unleased, improved spaces as well as the spaces then occupied by tenants.

"On February 22, 2016, the [town] received the plaintiff's appeals from the [town's] October 1, 2015 assessments on 322 Main Street and 322A Main Street.[2] That same day, counsel for the [town] sent a letter by email following up on its request for documentation and expressed doubt on behalf of the [town] that the required capital improvements had been made. The [town's] skepticism was based on the fact that the building permit values on record totaled approximately $800,000 over the term of the agreement, as well as the inspection of the property by representatives of the [town]. The plaintiff did not respond to this follow-up request. In the meantime, the plaintiff's appeals were denied without a hearing, and the plaintiff commenced this action on April 8, 2016,

---

[2] The October 1, 2015 assessment was not within the scope of the agreement, which extended only until the October 1, 2014 grand list.

challenging the assessments pursuant to both General Statutes (Rev. to 2015) § 12-117a[3] and § 12-119.[4]

"On June 9, 2016, counsel for the [town] again wrote to the plaintiff and, after summarizing prior efforts to document the capital expenditures claimed by the plaintiff, notified the plaintiff that the [town] considered the plaintiff to be in breach of the agreement. The

---

[3] General Statutes (Rev. to 2015) § 12-117a provides in relevant part: "Any person . . . claiming to be aggrieved by the action of the board of tax review or the board of assessment appeals, as the case may be, in any town or city may, within two months from the date of the mailing of notice of such action, make application, in the nature of an appeal therefrom . . . to the superior court for the judicial district in which such town or city is situated, which shall be accompanied by a citation to such town or city to appear before such court. . . . Any such application shall be a preferred case, to be heard, unless good cause appears to the contrary, at the first session, by the court or by a committee appointed by the court. . . . If, during the pendency of such appeal, a new assessment year begins, the applicant may amend his application as to any matter therein, including an appeal for such new year, which is affected by the inception of such new year and such applicant need not appear before the board of tax review or board of assessment appeals, as the case may be, to make such amendment effective. . . ."

All subsequent references to § 12-117a in this opinion are to the 2015 revision of the statute.

[4] General Statutes § 12-119 provides in relevant part: "When it is claimed . . . that a tax laid on property was computed on an assessment which, under all the circumstances, was manifestly excessive and could not have been arrived at except by disregarding the provisions of the statutes for determining the valuation of such property, the owner thereof or any lessee thereof whose lease has been recorded as provided in section 47-19 and who is bound under the terms of his lease to pay real property taxes, prior to the payment of such tax, may, in addition to the other remedies provided by law, make application for relief to the superior court for the judicial district in which such town or city is situated. Such application may be made within one year from the date as of which the property was last evaluated for purposes of taxation and shall be served and returned in the same manner as is required in the case of a summons in a civil action, and the pendency of such application shall not suspend action upon the tax against the applicant. In all such actions, the Superior Court shall have power to grant such relief upon such terms and in such manner and form as to justice and equity appertains, and costs may be taxed at the discretion of the court. If such assessment is reduced by said court, the applicant shall be reimbursed by the town or city for any overpayment of taxes in accordance with the judgment of said court."

[town] based its decision to cancel the agreement on the plaintiff's alleged failure to meet the capital improvement benchmarks under the agreement and its failure to provide the requested documentation of the plaintiff's claimed expenditures. The [town] advised the plaintiff that it was '[cancelling] the assessment benefits' under the agreement, that the property would be reassessed pursuant to the agreement and that the plaintiff would receive a 'revised or adjusted real estate tax bill.' On July 5, 2016, the [town] issued a 'real estate assessment change notice' that retroactively removed the tax abatements back to the 2009 grand list and calculated additional taxes owed by the plaintiff for each of the years covered by the . . . agreement. The total amount of supplemental tax calculated by the [town] was $378,717.02. The plaintiff has not paid these additional taxes levied by the [town]. Instead, the plaintiff filed an amended complaint in this action asserting the [town's] breach of the . . . agreement." (Footnotes added; footnotes omitted.)

In its tenth amended complaint,[5] the plaintiff claimed that (1) the town's 2015 assessment of the property was excessive in violation of § 12-117a and manifestly excessive in violation of § 12-119;[6] (2) the town breached the

[5] Following the trial, in its memorandum of decision, the court ordered the plaintiff to amend the complaint to conform to the proof at trial. See Practice Book § 10-60 (a) (1) ("[e]xcept as provided in Section 10-66, a party may amend his or her pleadings or other parts of the record or proceedings at any time subsequent to that stated in the preceding section . . . by order of judicial authority . . . .").

[6] Count one of the complaint also alleged that the failure of the town's board of assessment appeals to hold a hearing on the plaintiff's appeal from the October 1, 2015 assessment of 322A Main Street violated General Statutes (Rev. to 2015) § 12-111. The court observed that, when the board denied the plaintiff's appeal without a hearing, it treated both parcels, 322 Main Street and 322A Main Street, as a unified parcel. The parcel at 322A Main Street was a separate tax parcel, but, the court noted, both parties had been somewhat inconsistent in treating it as such. The court held that "[t]he board had the right to deny the appeal as to 322 Main without a hearing because that parcel was a 'commercial . . . property with an assessed value greater than one million dollars.' General Statutes (Rev. to 2015) § 12-111 (a) (1). 322A Main, however, did not have an assessed value in excess of $1 million and, if the town treated the parcels separately, there should have been a hearing as to

agreement by cancelling it after it had expired on its own terms and by retroactively reassessing the property for the grand list years of October 1, 2009, through October 1, 2014; **(3)** the town breached the implied duty of good faith and fair dealing by failing to request supporting documentation during the term of the agreement, then relying on the plaintiff's failure to supply such documentation as a basis for the posttermination cancellation of the agreement and imposition of retroactive reassessments; **(4)** the retroactive reassessment of the property for the tax years covered by the agreement was grounded on valuations of the property that were manifestly excessive in violation of § 12-119; and **(5)** the assessments for the grand list years from October 1, 2016, through October 1, 2022, were excessive in violation of § 12-117a. With respect to its claims concerning the agreement and the grand list years governed by it, the plaintiff sought money damages and an order voiding the retroactive reassessment of the property, or, in the alternative, reducing the valuation of the property for the reassessment years. With respect to its challenge to the town's assessment of the property for the grand list years of October 1, 2015, through October 1, 2022, the plaintiff sought a reduction of the valuations of the property for those years.

In its answer, the town asserted several special defenses, contending that **(1)** the plaintiff had failed to exhaust its administrative remedies by failing to submit a timely request to the board of assessment appeals to appeal from its assessments; **(2)** the court lacked subject matter jurisdiction because § 12-65b did not provide a statutory basis for appeal under § 12-119, and the agreement did not allow for appeals; and **(3)** the plaintiff's claims challenging the retroactive reassessment were barred for various reasons, including the doctrine of

322A Main." See General Statutes (Rev. to 2015) § 12-111 (a) (1) (board is not required to hold appeal hearing "for any commercial, industrial, utility or apartment property with an assessed value greater than one million dollars").

unclean hands, waiver, the plaintiff's alleged bad faith, and the plaintiff's failure to comply with §12-65b (a)(1).

Following a trial to the court, the court issued a memorandum of decision in which it found that neither party acted in bad faith. Regarding the plaintiff's capital improvement obligations under the agreement, the court concluded that, although the plaintiff had met the first two benchmarks, it breached the agreement on March 30, 2015, by failing to meet the third financial benchmark by that date. Accordingly, the court concluded that the town had the right to cancel the agreement based on the plaintiff's breach despite the fact that the contract had already expired on its own terms. The court rejected the town's claim that the plaintiff breached the agreement by failing to comply with its documentation and reporting requirements and found that the plaintiff had substantially complied with those requirements and that the town had waived enforcement of those provisions. The court also concluded that the town violated the agreement "by retroactively reassessing the property and revising the plaintiff's tax bills for the 2009 through 2013 grand lists." In arriving at this conclusion, the court relied on paragraph 6 of the agreement, which provides that, upon the town's cancellation of the agreement "for any reason," the reassessment of the property is limited to "the grand list immediately prior to the event for which the cancellation is made." Because the court had found that the plaintiff breached the agreement on March 30, 2015, it reasoned that the town's right to reassess the property pursuant to the agreement was limited to "the adjusted tax bill for 2015, based on the October 1, 2014 grand list."

Regarding the plaintiff's tax appeals pursuant to §12-117a, the court found that the town's assessments in 2013 and 2018, upon which the tax bills for the grand list years from October 1, 2015, through October 1, 2022, were grounded, overvalued the property. The court held that the plaintiff was "entitled to relief from those assessments in accordance with the court's findings on market

value for 2013 and 2018." Specifically, the court found that the market value of 322 Main Street was $4,810,000 in 2013, and $4,606,000 in 2018, and that the market value of the plaintiff's interest in 322A Main Street was $6400 in both 2013 and 2018. Accordingly, as to the plaintiff's challenge to the grand list assessments from October 1, 2015, through October 1, 2022, the court ordered "that taxes shall be assessed based upon 70 percent of these full fair market valuations at the applicable mill rate for each tax year." Finally, the court rejected the plaintiff's claims for wrongful assessment pursuant to § 12-119 for the grand list years of October 1, 2014, and October 1, 2015, on the basis that the plaintiff had failed to prove, as required by the statute, that **(1)** the assessments were manifestly excessive and **(2)** the town arrived at the assessments "by disregarding the provisions of the statutes for determining the valuation of the property."[7]

Following the issuance of the court's memorandum of decision, the town filed a motion to reargue. In its motion, in addition to taking issue with the court's conclusion that the agreement permitted the consideration of the plaintiff's pre-agreement expenditures in determining whether the plaintiff had met the agreement's benchmarks, the town sought clarification of the court's statement in the conclusion of its decision, that "the [town's] right to revise and readjust the taxes on the property is limited to the taxes due based on the 2014 grand list." The town contended that, because the court had directed the town to utilize the court's fair market valuations of the property for the grand lists from October 1, 2015, through October 1, 2022, it was unclear what value the town should use for purposes of reassessing the property for the October 1, 2014 grand list. The town argued that, unlike the assessments for the grand lists from October 1, 2016, through October

---

[7] Because the court concluded that the town improperly retroactively reassessed the property for the grand list years of October 1, 2009, through October 1, 2013, the court did not address the plaintiff's claim that those reassessments violated § 12-119.

1, 2022, the assessment for the grand list for October 1, 2014, is governed by the agreement, which authorizes the town to reassess the property upon cancellation of the agreement by the town. The town further sought to recover interest on the delinquent portion of the taxes owed on the property in connection with the October 1, 2014 grand list assessment from August 6, 2016, the date on which the taxes were due and payable.

The court granted in part the motion to reargue, limited to the town's request for clarification regarding which valuation of the property should govern with respect to the grand list of October 1, 2014, i.e., the town's retroactive reassessment or the court's determination of the 2013 fair market value. The court clarified that, "notwithstanding [the court's] findings with respect to the 2013 valuation, the [town's] retroactive assessment for October 1, 2014 is applicable." The court declined to award interest on the taxes that were due as a result of the retroactive assessment, observing that the town raised this issue for the first time in the motion to reargue. This appeal and this cross appeal followed. Additional relevant facts and procedural history will be set forth as necessary.

I

We first consider the town's claim that, in determining that the plaintiff met the agreement's first two financial benchmarks, the trial court improperly considered amounts that the plaintiff had spent on capital improvements prior to the execution of the agreement. The town argues that the agreement unambiguously precludes the consideration of expenditures made prior to the execution of the agreement.[8] We disagree.

The following additional background is relevant to our resolution of this issue. In accordance with the November

[8]The town also argues that the court's interpretation of the agreement violates one of the most fundamental rules of contract law—that a contract must be supported by consideration. Specifically, the town claims that, by relying on the plaintiff's pre-agreement expenditures in finding that the plaintiff met the first two financial benchmarks of

6, 2008 vote of the town's Board of Selectmen, the town and the plaintiff entered into the agreement pursuant to § 12-65b (a) (1). See footnote 1 of this opinion. Consistent with § 12-65b (a) (1), in the agreement, the town promised to fix the assessment for the property at the agreed upon amount in exchange for the plaintiff's promise to expend no less than $3 million in capital improvements on the property. Paragraph 4 of the agreement, which sets forth the capital improvements requirements, provides in relevant part: "During the term of this [a]greement, [the plaintiff] shall comply with the following requirements: (a) By September 30, 2011, [the plaintiff] shall have caused capital improvements to be made to the [p]roperty, including but not limited to, the on and off premises parking lot construction and improvements, in a cost amount of no less than $900,000; (b) By September 30, 2013, [the plaintiff] shall have caused capital improvements to be made to the [p]roperty, including but not limited to, the on and off premises parking lot construction and improvements, in a cost amount of no less than $1.5 million; (c) By March 30, 2015, [the plaintiff] shall have caused capital improvements to be made to the

the agreement, the court construed the agreement in a manner that potentially would render tax assessment agreements such as the one at issue in the present case enforceable despite a lack of consideration. We disagree.

The town relies on the principle that "past consideration . . . will not support a promise." (Internal quotation marks omitted.) *Schimenti Construction Co., LLC* v. *Schimenti*, 217 Conn. App. 224, 246, 288 A.3d 1038 (2023). If only past consideration were at issue, the town's argument would be persuasive. The town's argument overlooks, however, the well established rule that, so long as there is valid consideration to support the contract, the fact that some of the proffered "consideration" may be invalid does not render the contract unenforceable. See *General Electric Capital Corp.* v. *Transport Logistics Corp.*, 94 Conn. App. 541, 547, 893 A.2d 467 (2006) ("[a]n agreement to pay for both past and future services will be sustained as to both if the latter be performed" (internal quotation marks omitted)); 1 Z. Wolfe, Farnsworth on Contracts (4th Ed. 2022) § 2.03, p. 2-7 ("as long as part of what is given in exchange for a promise is consideration it is immaterial that the rest is not"). In the present case, even if the plaintiff's pre-agreement expenditures were invalid as "past consideration," the plaintiff's expenditures during the term of the agreement would still constitute valid consideration.

[p]roperty, including but not limited to, the on and off premises parking lot construction and improvements, in a cost amount of no less than $3 million."

Paragraph 4 defines "cost amount" to mean "actual costs incurred in construction, interior or exterior, at the [p]roperty, including those costs spent in renovations or rehabilitations to the buildings, the bridge and the existing or proposed parking areas. The term shall not include [the plaintiff's] own work, overhead or time, or any of the work, overhead or time of [the plaintiff's] principals, employees, subsidiaries or affiliates. Notwithstanding the foregoing, the term shall include hard costs incurred by any affiliate of [the plaintiff] for construction so long as they are legitimate arms length hard costs."

One of the issues at trial, closely intertwined with the question of whether the plaintiff's pre-agreement capital expenditures may be considered in determining whether the plaintiff met its capital improvement obligations under the agreement, was whether invoices for work performed by TWB Properties, LLC (TWB), qualified as "cost amounts" under the agreement. The court held that they did not because the plaintiff's principal, Thomas Briggs, was also the "managing member" of TWB. As the court explained, Briggs "described both companies as his companies and explained that TWB is his 'management and construction' arm." The court rejected the plaintiff's contention that the invoices submitted by TWB qualified as cost amounts because they constituted "hard costs" incurred by one of the plaintiff's affiliates. Although the agreement does not define the term "hard costs," the court read that term together with the previous sentence, which excludes the plaintiff's "own work, overhead or time, or any of the work, overhead or time of [the plaintiff's] principals, employees, subsidiaries or affiliates" from the definition of "cost amount." The "hard costs" exception to that exclusion, the court reasoned, reflects "the parties' recognition that TWB or another affiliate of the plaintiff may be hiring contractors and purchasing materials to perform construction work and that

the parties did not intend to exclude those costs, merely because they were incurred by an affiliate rather than the plaintiff itself." Accordingly, the court interpreted the "hard costs" exception to mean that an affiliate's payments for materials, as well as payments for labor provided by third parties, qualify as "cost amounts" under the agreement.[9]

The court's conclusion that invoices for work performed by TWB on the property did not qualify as "cost amounts" pursuant to the agreement significantly impacted the calculation of the plaintiff's total capital expenditures, particularly those relevant to the plaintiff's compliance with the agreement's first financial benchmark of $900,000 in capital expenditures by September 30, 2011. Specifically, the exclusion of the TWB invoices rendered it necessary to resolve whether the plaintiff's capital expenditures prior to July 2, 2009, may be considered in determining whether the plaintiff met the first benchmark. As the court explained, "[b]etween July 2, 2009, and September 30, 2011, the costs documented by the plaintiff amount to $1,312,272.83, substantially in excess of the $900,000 benchmark. TWB billed $437,226.03 of the total costs for that period. Excluding the costs paid to TWB, total incurred costs for the period were $875,046.80, just below the agreement's first benchmark. A review of the TWB invoices reflects the vast majority of the TWB invoices sought to recover labor costs for construction, construction management and maintenance. While there is an occasional reference to 'materials,' the cost of materials is not separately stated. Prior to July 2, 2009, the plaintiff incurred a total of $274,419.50 in costs, $135,494.90 of which are attributable to TWB. Aside from the TWB expenditures, the plaintiff incurred $138,924.60 in costs prior to July 2, 2009, that, in addition to the $875,046.80 in costs not

---

[9] The plaintiff does not challenge on appeal the court's ruling that the majority of TWB's invoices do not qualify as cost amounts pursuant to the agreement.

attributable to TWB, would exceed the September 30, 2011 benchmark of $900,000."[10]

Thus, because the court concluded that the TWB invoices may not be considered in determining whether the plaintiff met its contractual obligations, the question of whether the plaintiff's pre-agreement expenditures may be considered is dispositive as to whether the plaintiff breached the agreement as of September 30, 2011. To resolve that question, the court examined the language of the agreement. The court began by observing that the term of the agreement commenced on July 2, 2009. The agreement did not, however, "specify any starting date" for the plaintiff's capital expenditures, requiring only that, "during the term of [the] [a]greement," the plaintiff meet each of the three financial benchmarks. The court noted that the purpose of the agreement was to incentivize the plaintiff to expend $3 million in capital improvements to the property by March 30, 2015, and that the benchmarks served the purpose of ensuring that the plaintiff progressed toward that goal. In the absence of specific contractual language to the contrary, the court construed the agreement to require only that the plaintiff meet the financial benchmarks during its term and declined to read an intent into the agreement to exclude any pre-agreement investments made by the plaintiff.

"The standard of review for the interpretation of a contract is well established. Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [when] there is definitive contract language, the determination of what the parties intended by their . . . commitments is a question of law [over which our review is plenary]. . . . If the language of [a] contract is susceptible to more than one reasonable interpretation, [however] the contract is

---

[10]With respect to the second benchmark, which required the plaintiff to have expended a cost amount of no less than $1.5 million in capital improvements to the property by September 30, 2013, the court found that $22,210 billed to the plaintiff by TWB constituted cost amounts pursuant to the agreement.

ambiguous. . . . Ordinarily, such ambiguity requires the use of extrinsic evidence by a trial court to determine the intent of the parties, and, because such a determination is factual, it is subject to reversal on appeal only if it is clearly erroneous." (Internal quotation marks omitted.**)** *Joseph General Contracting, Inc.* v. *Couto*, **317 Conn. 565, 575, 119 A.3d 570 (2015).** Notwithstanding the general rule that a trial court's interpretation of an ambiguous contract is subject to review for clear error, when, as in the present case, the court received no extrinsic evidence of the parties' intent in interpreting the contract and relied solely on the language of the agreement in construing it, the court's construction is effectively undertaken as a matter of law. See *Stiegler* v. *Meriden*, **348 Conn. 452, 471–72, 307 A.3d 894 (2024).** Under such circumstances, our review is plenary. See id., 465.

The following contract principles guide us in construing the agreement. "The intent of the parties as expressed in a contract is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . . [T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . .

"[I]n construing contracts, we give effect to all the language included therein, as the law of contract interpretation . . . militates against interpreting a contract

in a way that renders a provision superfluous." (Internal quotation marks omitted.) *Prymas* v. *New Britain*, 122 Conn. App. 511, 517–18, 3 A.3d 86, cert. denied, 298 Conn. 915, 4 A.3d 833 (2010).

"A contract is unambiguous when its language is clear and conveys a definite and precise intent. . . . In contrast, a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . [A]ny ambiguity in a contract must emanate from the language used by the parties. . . . The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so. . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." (Citations omitted; internal quotation marks omitted.) *United Illuminating Co.* v. *Wisvest-Connecticut, LLC*, 259 Conn. 665, 670–71, 791 A.2d 546 (2002).

We conclude, as did the trial court, that the "term of the agreement" commenced on July 2, 2009. The first line of the agreement states that the parties "entered into" the contract on that date. The disagreement between the parties, however, does not directly concern the date on which the agreement's term commenced but rather whether the court properly considered the plaintiff's expenditures prior to that date in determining that the plaintiff met the first financial benchmark. The operative section of the agreement as to the plaintiff's capital expenditure obligations is paragraph 4, which begins by stating that, "[d]uring the term of this [a]greement, [the plaintiff] shall comply with the following requirements . . . ." Following that introductory statement, subsection (a) of paragraph 4 requires the plaintiff, "[b]y September 30, 2011," to "have caused capital improvements to be made to the property . . . in a cost amount of no less than $900,000." The language in subsections (b) and (c) of paragraph 4 mirrors that of subsection (a), respectively requiring the plaintiff "[b]y September 13, 2013" to "have caused capital improvements to be

made to the property . . . in the amount of no less than $1.5 million" and "[b]y March 30, 2015" to "have caused capital improvements to be made to the property . . . in a cost amount of no less than $3 million."

By its express terms, this language establishes that the plaintiff was obligated to make capital improvements to the property "by" the specified dates. Thus, paragraph 4 identifies a point in time *by which* the plaintiff was required to have met the stated capital improvement requirement; it does not state a starting point from which the plaintiff's compliance with each benchmark must be measured. In fact, the language, which requires the plaintiff to meet each benchmark "by" the specific dates, suggests that the parties were solely focused on the date by which the plaintiff was obligated to complete its obligations. Presumably, therefore, in determining whether the plaintiff had met the second benchmark on September 30, 2013, which required the plaintiff to have expended $600,000 in addition to the $900,000 in capital improvements required by September 30, 2011—for a total of $1.5 million—if the plaintiff had expended $1 million by September 30, 2011, the surplus of $100,000 would apply toward determining whether the plaintiff had met the total goal of $1.5 million by September 30, 2013, despite the fact that the $100,000 was actually spent before September 30, 2011. Nothing in the express language of paragraph 4 focuses on the commencement of the plaintiff's expenditures—instead, the focus is entirely on the completion dates for those expenditures.

The only express requirement in paragraph 4 of the agreement, therefore, is that the plaintiff expend the defined amounts in capital improvements by the benchmark dates. The introductory statement, that "[d]uring the term of this [a]greement, [the plaintiff] shall comply with the following financial requirements," is just that, a general introduction that emphasizes the parties' intent that the plaintiff *complete* the work "during the term

of this [a]greement."[11] The "financial requirements" referred to in the introduction are then set forth in each of the three subparagraphs, and although those requirements specify an end date, nothing in the three subparagraphs specifies a starting date.

We do deem it reasonable, however, to interpret the introductory phrase, "[d]uring the term of this [a]greement," to suggest that only expenditures made during the term of the agreement qualify as "cost amounts" pursuant to paragraph 4. Because the language lends itself to two reasonable interpretations, it is ambiguous. See *Harbour Pointe, LLC* v. *Harbour Landing Condominium Assn., Inc.*, 300 Conn. 254, 261, 14 A.3d 284 (2011) ("[i]f the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous" (internal quotation marks omitted)). Other provisions in the agreement fail to clarify the ambiguity. The only other reference to the phrase "[d]uring the term of this [a]greement" is in one of the recitals at the beginning of the contract. That recital indicates that, on November 6, 2008, prior to the commencement of the agreement, the town's Board of Selectmen voted to enter into the agreement "after finding that the [plaintiff] has promised to expend on improvements to the [p]roperty no less than $3 million in capital costs *during the term*

---

[11] In support of its position that the phrase "[d]uring the term of this [a]greement" in paragraph 4 of the agreement precludes the plaintiff's pre-agreement expenditures from being considered "cost amounts" under the agreement, the town cites *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, 346 Conn. 391, 291 A.3d 64 (2023). In that case, our Supreme Court looked to dictionary definitions to interpret the term "duration" as used in General Statutes § 20-235, which defined the term to mean "a portion of time which is measurable or during which something exists, lasts, or is in progress . . . [and] [t]he length of time something lasts." (Internal quotation marks omitted.) Id., 406. We do not disagree that this definition of "duration" is a reasonable one. The meaning of the term "duration," however, is not in dispute, and its definition does not resolve whether the phrase "[d]uring the term of this [a]greement" in paragraph 4 of the agreement was intended to express the parties' intent to exclude both pre-agreement and post-termination expenditures from the meaning of "cost amount" or only posttermination expenditures.

*of this* [*a*]*greement.*" (Emphasis added.) This language, like the introductory language in paragraph 4, is ambiguous. The recital merely states what the board "found" at the time that it voted to enter into the agreement and fails to clarify whether, at that time, the board had any knowledge of when the agreement would commence. Moreover, at the time of the board's November 6, 2008 vote, the plaintiff had not yet purchased the property.

The fact that this use of the phrase occurs in a recital further limits its significance. "It is not uncommon for written contracts to begin with a series of . . . recitals of the surrounding circumstances and of the objectives of the parties. Traditionally prefixed by the word whereas, contract recitals are not ordinarily drafted as promises or conditions. Although their proper role in the interpretation of the main body of the contract has sometimes been unclear, it is plain that they are frequently intended to, and often do, shed light on the circumstances the parties wished to have considered in the interpretation of the contract." (Footnote omitted.) 2 Z. Wolfe, Farnsworth on Contracts (4th Ed. 2022) § 7.11, p. 7-107. Our Supreme Court has relied on recitals to shed light on the parties' intent. See, e.g., *Centerplan Construction Co., LLC* v. *Hartford*, 343 Conn. 368, 393, 274 A.3d 51 (2022). Although courts have relied on recitals, "they have been wary" about giving them effect. 2 Z. Wolfe, supra, § 7.11, p. 7-108 n.21; see also *Abraham Zion Corp.* v. *Lebow*, 761 F.2d 93, 103 (2d Cir. 1985) ("[a]lthough a statement in a whereas clause may be useful in interpreting an ambiguous operative clause in a contract, it cannot create any right beyond those arising from the operative terms of the document" (internal quotation marks omitted)). If the recital were unambiguous, it could shed light on the meaning of the ambiguous, operative language in paragraph 4 of the agreement. See *Tomey Realty Co.* v. *Bozzuto's, Inc.*, 168 Conn. App. 637, 653 n.10, 147 A.3d 166 (2016) ("[I]f the recitals in a contract are clear and the operative part is ambiguous, the recitals govern the construction; however, if the recitals are ambiguous and the operative part is clear, the operative part must prevail.

If both the recitals and the operative part are clear, but they are inconsistent with each other, the operative part must control." **(Emphasis omitted; internal quotation marks omitted.)).** In the present case, however, where the meaning of the phrase as used in both the operative provision and the recital is ambiguous, the recital is of little significance.

Because the agreement is ambiguous as to whether the parties intended that the plaintiff's pre-agreement expenditures qualify as cost amounts for purposes of paragraph 4, the court properly looked to the parties' purpose in resolving the ambiguity. See, e.*g.*, *Cruz* v. *Visual Perceptions, LLC*, 311 Conn. 93, 106, 84 A.3d 828 (2014) **(where contract language was ambiguous, trial court was required to consider extrinsic evidence and make factual findings as to parties' intent).** Indeed, according to § 202 of the Restatement (Second) of Contracts, "if the principal purpose of the parties is ascertainable it is given great weight" in interpreting the contract. 2 Restatement (Second) Contracts § 202 (1), p. 86 (1981); see also 2 Z. Wolfe, supra, § 7.11, pp. 7-105–106.

In the present case, the court found that "[t]he purpose of the agreement, which the parties executed pursuant to . . . § 12-65b and whose basic financial terms were approved by the [town] on [November 6, 2008], was to incentivize the plaintiff to invest $3 million in the property by March 30, 2015. The purpose of the benchmarks was to ensure the plaintiff was progressing toward that goal." The parties' purpose, therefore, was to incentivize the plaintiff to complete the capital improvements before the agreement had ended and to meet each of the financial benchmarks before the three specified dates. Giving "great weight" to that overarching purpose; 2 Restatement (Second), supra, § 202 (1), p. 86; we conclude that the more reasonable reading of the phrase "[d]uring the term of this [a]greement" in paragraph 4 is that it emphasizes that the plaintiff was required to meet all of the financial benchmarks before the term of the agreement ended and that it did not signify an intent

of the parties to exclude the plaintiff's pre-agreement capital expenditures from the meaning of "cost amount" as used in paragraph 4.

In sum, we conclude that the court, in determining that the plaintiff met the agreement's first two financial benchmarks, properly considered amounts that the plaintiff had spent on capital improvements prior to the execution of the agreement.

## II

We next address the town's claim that the trial court improperly concluded that the limitation of remedies provision in the agreement permits the town to assess retroactively the property only for the final year covered by the agreement. Specifically, the town claims that the court's construction of the agreement runs counter to the statutory requirements of §12-65b. We disagree.

The following additional procedural background is relevant to our resolution of this claim. As we have explained, after the town had cancelled the agreement in July, 2016, it issued a real estate assessment change notice that retroactively removed the tax abatements, going back to the 2009 grand list,[12] which it had granted the plaintiff pursuant to the agreement, and calculated additional taxes owed by the plaintiff, for a total of $378,717.02 in supplemental taxes. Although the court rejected the plaintiff's claim that the town lacked authority to cancel the agreement after its term had expired, the court also concluded that the town had exceeded its available contractual remedy by reassessing the property for all of the years covered by the agreement. In so concluding, the court relied on paragraph 6 of the agreement, which provides in relevant part that, "[i]n the event of cancellation by the [t]own for any reason under this [a]greement, the [p]roperty will be reassessed by the [t]own [a]ssessor effective with the [g]rand [l]ist

---

[12] As noted by the court, the July, 2016 reassessment did not include the 2009 tax year, which was based on the October 1, 2008 grand list assessment.

immediately prior to the event for which the cancellation is made." The court concluded that the plaintiff had met the first two benchmarks and had breached the agreement by failing to meet the third benchmark by March 30, 2015. Because the grand list immediately preceding the plaintiff's March 30, 2015 breach, which was "the event for which the cancellation [was] made," was the October 1, 2014 grand list, the final grand list covered by the agreement, the court concluded that the town's remedy was limited to reassessing the tax on the property solely for that grand list.

The town claims that, because the agreement was executed pursuant to § 12-65b (a) (1), which authorizes municipalities to enter into a tax assessment agreement with a property owner for a period of not more than seven years, provided the cost of improvements to the property is not less than $3 million, the limitation of remedies provision in the agreement cannot be applied to a cancellation grounded on the plaintiff's failure to make $3 million in improvements to the property. The town appears to suggest that, because § 12-65b (a) (1) authorizes a municipality to enter into a tax assessment agreement with a property owner only if the agreement requires the property owner to make improvements to the property costing "not less than three million dollars," a property owner's breach of such an agreement by failing to make the required investment strips the town, retroactively, of the statutory authority to grant the tax abatement and renders the entire contract void and unenforceable. The court's interpretation of the limitation of remedies provision, which permitted the plaintiff to retain some of the tax abatements despite the plaintiff's failure to meet its obligation to make capital improvements to the property in a cost amount of not less than $3 million, the town argues, permits tax assessment agreements "that dramatically deviate from the terms required by [§ 12-65b (a) (1)]."

The question of whether § 12-65b (a) (1) precludes a tax assessment agreement from limiting a municipality's

remedies when a property owner breaches the agreement by failing to make the statutorily required capital expenditures presents an issue of statutory construction over which we have plenary review. See *Civic Mind, LLC* v. *Hartford*, 229 Conn. App. 615, 637, 328 A.3d 225 (2024), cert. denied, 351 Conn. 919, 333 A.3d 103 (2025). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . It is a basic tenet of statutory construction that [w]e construe a statute as a whole and read its subsections concurrently in order to reach a reasonable overall interpretation." (Internal quotation marks omitted.) Id., 637–38.

The town identifies no language in § 12-65b, nor do we discern any, that addresses the consequences of a breach of an agreement entered into by a municipality pursuant to the statute. In fact, on its face, the scope of the statute is limited to establishing the necessary prerequisites in order for a town to be granted authority to "enter into" such an agreement. Specifically, General Statues (Rev. to 2009) § 12-65b provides in relevant part: "(a) Any municipality may . . . enter into a written agreement with any party owning . . . an interest in real property in such municipality . . . fixing the assessment of the real property . . . which is the subject of the agreement, and all improvements thereon or therein . . . (1) for a period of not more than seven years, provided the cost of such improvements to be constructed is not less than three million dollars . . . ." See footnote 1 of this opinion. Put simply, this language specifies the conditions that a tax

assessment agreement must meet in order to authorize a municipality to enter into it pursuant to §12-65b(a)(1).

The agreement in the present case complied with the statutory requirements, which are plain and unambiguous. Specifically, in paragraph 1 of the agreement, subject to the plaintiff's fulfillment of its contractual obligations, the town promised to fix the grand list assessment for the property for a period of seven consecutive grand lists at the agreed upon amount, as set forth in paragraph 8 of the agreement. In exchange, among other things, the plaintiff promised to comply with the financial benchmarks set forth in paragraph 4, as discussed in detail in part I of this opinion, for a total investment of $3 million by March 30, 2015. The inclusion of these provisions satisfied the requirements of §12-65b(a)(1), thereby providing the town with the statutory authority to "enter into" the agreement. Nothing in the statutory language, however, prohibits the parties to a tax assessment agreement from structuring the agreement to require a property owner to meet financial benchmarks along the way toward the total required investment in the property, and nothing in the statute speaks to the manner in which the parties may limit remedies for a breach of the contract. In the absence of any evidence of a legislative intent to limit the freedom of contract, we will not read such limitations into the statute. See *American Family Mutual Ins. Co.* v. *Federated Mutual Ins. Co.*, 775 N.E.2d 1198, 1206 (Ind. App. 2002) ("[b]ecause we value the freedom to contract so highly, we will not find that a contract contravenes a statute unless the language of the implicated statute is clear and unambiguous that the legislature intended that the courts not be available for either party to enforce a bargain made in violation thereof").

### III

We next address the town's claim that the trial court improperly concluded that it waived its right to enforce the reporting requirements of paragraph 15 of the agreement. Specifically, the town claims that, because the

agreement did not impose upon it a duty to remind the plaintiff of the plaintiff's obligation to submit the semiannual reports required by paragraph 15, the court improperly relied solely on the town's inaction and silence in concluding that it waived enforcement of that provision.[13] We disagree.

The following additional factual and procedural background is relevant to our resolution of this claim. As we detailed earlier in this opinion, the town predicated its cancellation not only on the plaintiff's failure to meet the agreement's capital expenditure requirements, but also on the plaintiff's failure to comply with reporting requirements that are set forth in two separate paragraphs of the agreement. Paragraph 4, which sets forth the plaintiff's capital expenditure requirements, also requires the plaintiff to "provide, upon request, any and all such financial or other information, including backup and invoices, relating to capital improvements, as may be reasonably requested by the [t]own to review compliance with this requirement." Paragraph 15 also imposes a reporting requirement upon the plaintiff, requiring it to provide the town "or its appointed agent or subcommittee, with thorough reports on the rehabilitation work, the expenditures, the plan for development of the [p]roperty, the tenants, and other matters related to the development of the [p]roperty. These reports shall be [semiannual] or at more frequent times as the Board of Selectmen reasonably [may] request."

During trial, Briggs conceded in his testimony that the plaintiff had not provided the semiannual reports to the town as required by paragraph 15 of the agreement. He further testified, however, that James Finger, the town's economic development coordinator, was his principal contact with the town and the only town representative who was actively involved with Briggs regarding the plaintiff's fulfillment of its capital expenditure obligations

---

[13] The town incorrectly states that § 12-65b required the plaintiff to submit written reports. The statute sets forth no reporting requirement of any kind, oral or written. See footnote 1 of this opinion. Accordingly, our analysis of this issue is confined to the town's contractual claims.

under the agreement. Briggs testified that, over the course of the agreement's term, he spoke or emailed with Finger frequently, often "a couple of times a week." He provided Finger with information concerning the costs incurred by the plaintiff in making improvements to the property "when requested." Matthew Vertefeuille, the town's director of development, confirmed that Finger and Briggs communicated "a lot" with each other regarding the development of the property.

In March, 2012, in connection with the plaintiff's application for residential zoning approval for a portion of the property, Finger requested documentation from Briggs regarding the plaintiff's expenditures. In response, Briggs provided Finger with a document summarizing the costs incurred by the plaintiff as of March, 2012, totaling almost $2,400,000.[14] Briggs had meetings regarding the zoning application with the town council, the town planning and zoning commission, and the town economic development commission. At none of those meetings did any representative of the town request additional information or documentation regarding the benchmarks from the plaintiff. Other than this single instance, neither Finger, nor any other representative of the town, requested financial information or backup invoices from the plaintiff until November 5, 2015, when an attorney for the town contacted the plaintiff seeking an accounting.

With respect to the reporting requirement in paragraph 4 of the agreement, which is triggered only upon a request by the town, the court noted that it was undisputed that the town made its first request for information regarding the plaintiff's capital expenditures in November, 2015. The court found that the plaintiff failed to comply with that request. The court explained, however, that, even if that failure constituted a breach of the agreement, that breach would not make a "material difference" in

[14]Although the plaintiff sought to have the document admitted into evidence as a full exhibit, the court sustained the town's objection thereto. Accordingly, our summary of the document relies solely on Briggs' testimony regarding its contents.

the court's holding that the town was entitled to reassess the property only for the last grand list covered by the agreement. That is, because paragraph 6 of the agreement limited the town's ability to reassess the property due to a breach of the agreement by the plaintiff "effective with the [g]rand [l]ist immediately prior to the event for which the cancellation is made," to the extent that the town's cancellation of the agreement may have been predicated on the plaintiff's November, 2015 failure to comply with the reporting requirement in paragraph 4, the town's remedy would have been limited to reassessing the property for the grand list of October 1, 2015, which was not covered by the agreement.

Unlike the reporting requirement in paragraph 4, the plaintiff's obligation to provide semiannual reports pursuant to paragraph 15 of the agreement is not conditioned upon a request by the town. The court noted, however, that, because there is some overlap between the two provisions, it considered the town's failure to request documentation pursuant to paragraph 4 in evaluating the town's claim that the plaintiff breached the agreement by failing to comply with paragraph 15's reporting requirements. The court found that "Briggs was in regular contact, orally and in writing . . . on the subjects identified in paragraph 15" with Finger, whom the court found to be the town's agent. By keeping Finger informed of the various aspects of the development, the court reasoned, the plaintiff substantially complied with paragraph 15's reporting requirements.[15] The court

---

[15] The town claims that the court's finding that the plaintiff substantially complied with the reporting requirements set forth in paragraph 15 of the agreement was clearly erroneous. Specifically, the town contends that the evidence presented at trial demonstrated that Briggs did not provide Finger with any financial information during their communications, and, therefore, those communications do not support the court's finding that the plaintiff substantially complied with its contractual obligation, pursuant to paragraph 15 of the agreement, to provide "thorough reports . . . on expenditures . . . related to the development of the property." Because we conclude that the court's finding that the town waived the reporting requirements was not clearly erroneous, we need not address this claim.

further concluded that the town's repeated failure to seek a formal report in place of, or in addition to, the regular updates provided by Briggs to Finger amounted to a waiver on behalf of the town of strict compliance with paragraph 15's reporting requirement, on the basis of its finding that "the [town] repeatedly failed to enforce that provision, and instead demonstrated its satisfaction with the regular communication between Briggs and Finger, the [town's] agent."

The principles governing waiver are well settled. "[B]ecause waiver [is a question] of fact . . . we will not disturb the trial court's [finding] unless [it is] clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation marks omitted.) *Grey* v. *Connecticut Indemnity Services, Inc.*, 112 Conn. App. 811, 815, 964 A.2d 591 (2009).

"Waiver involves an intentional relinquishment of a known right. . . . Waiver does not have to be express, but may consist of acts or conduct from which waiver may be implied. . . . In other words, waiver may be inferred from the circumstances if it is reasonable to do so." (Internal quotation marks omitted.) *Shelton* v. *Olowosoyo*, 125 Conn. App. 286, 294, 10 A.3d 45 (2010). Particularly relevant to the present case, "it is a settled principle of contract law that a party to an executory bilateral contract waives a material breach by the other party if he continues the business relationship, and accepts future performance without some warning that the contract is at an end." (Internal quotation marks omitted.) *RBC Nice Bearings, Inc.* v. *SKF USA, Inc.*, 318 Conn. 737, 749, 123 A.3d 417 (2015); see also 13 R. Lord, Williston on Contracts (4th Ed. 2000) § 39.31, pp. 637–42 ("[a] party to a contract may waive a condition precedent to its performance, or a breach of the contract's provisions, by conduct manifesting a continued recognition of the

contract's existence after learning of the breach or failure of the condition, such as by continuing to perform or accepting performance under the contract and receiving the benefit of it").

In finding that the town waived its right to enforce the reporting requirement in paragraph 15 of the agreement, the court relied on the town's repeated failure to enforce that provision throughout the term of the agreement. It is undisputed that the plaintiff failed to submit *any* of the semiannual, "thorough reports on the rehabilitation work," as required by paragraph 15 of the agreement. Because the agreement was executed on July 2, 2009, the first of those semiannual reports was due six months after that date, on or around January 2, 2010. At that time, therefore, the town was on notice that the plaintiff had breached paragraph 15's reporting requirement. Rather than seek enforcement of the provision, however, the town continued to perform its obligations thereunder and continued to accept performance by the plaintiff of its obligation pursuant to the agreement to make capital improvements to the property. Additionally, the court expressly found that the town also continued to accept Briggs' provision of information regarding the subjects identified in paragraph 15 through the regular, informal communications that he had with Finger. Under these circumstances, the court's finding that the town waived enforcement of paragraph 15 was not clearly erroneous.[16]

## IV

We next address the town's claim that the trial court improperly admitted into evidence two exhibits proffered by the plaintiff: exhibit seventeen, which consisted of 1327 pages of records documenting the plaintiff's claimed capital expenditures on the property, and exhibit

---

[16]The town contends that the court relied solely on its inaction and silence in finding that it waived its right to enforce paragraph 15's reporting requirements. We disagree. As we have explained, the court properly relied on the town's conduct to find that it waived its right to enforce the provision, specifically, the town's continued performance and acceptance of the plaintiff's performance under the agreement.

sixteen, a document summarizing those records. It is undisputed that, if exhibit seventeen were not admissible, neither would be exhibit sixteen, which was admitted as a summary of exhibit seventeen pursuant to §10-5 of the Connecticut Code of Evidence.[17] Relying on that principle, the town claims that the court's admission of both exhibits into evidence was improper because the plaintiff failed to authenticate exhibit seventeen as a business record,[18] and because the admission of exhibit seventeen unfairly prejudiced the town by rendering it impossible to challenge each individual record as a business record that evidences a relevant cost incurred pursuant to the plaintiff's capital expenditures obligation under the agreement. The town also claims that the court improperly admitted exhibit sixteen into evidence because the plaintiff failed to demonstrate that the originals or copies of the documents in exhibit seventeen were

---

[17] Section 10-5 of the Connecticut Code of Evidence provides: "The contents of voluminous writings, recordings or photographs, otherwise admissible, that cannot be conveniently examined in court, may be admitted in the form of a chart, summary or calculation, provided that the originals or copies are available upon request for examination or copying, or both, by other parties at a reasonable time and place."

[18] The plaintiff contends that the town failed to preserve its claim that the court improperly admitted exhibit seventeen pursuant to the business records exception to the hearsay rule. We disagree. The town did not object expressly on the basis that the documents in exhibit seventeen constituted "hearsay." Counsel for the town did, however, object to the exhibit's admission, arguing that "here we have a situation where, you know, I know [I] would agree that [the plaintiff] could say well, these are my records if they were all bank statements or if they were all, you know, things, but what we have is just this host of different stuff that may or may not individually be admissible, and that's a problem. So, to the extent [that the plaintiff is] going to put on, presumably, are these the records you kept in the ordinary course of business, I respectfully maintain that these things in and of themselves are not necessarily admissible without further foundation . . . ." Although the town's objection should have been stated more clearly, its argument to the court is clear enough to allow us to conclude that its position was that, in order to establish that the business records exception to the hearsay rule applied, the plaintiff was required to establish that each individual document within exhibit seventeen constituted a record kept in the ordinary course of business. That is precisely the claim that the town now raises in this appeal.

"provided . . . for examination or copying, or both," as required by § 10-5 of the Connecticut Code of Evidence. We conclude that the court did not abuse its discretion in admitting these two exhibits.

The following additional facts and procedural history are relevant to our resolution of the town's claims. During Briggs' testimony at trial, pursuant to § 10-5 of the Connecticut Code of Evidence, the plaintiff sought to introduce exhibit sixteen into evidence as a summary of exhibit seventeen, which had not yet been admitted into evidence. The town objected on several bases, arguing that the summary document was inadmissible because (1) the plaintiff had failed to establish that the document had "been kept in the ordinary course of business," and it was evident that, to the contrary, it had been created for the purpose of litigation, (2) it could be introduced into evidence only if exhibit seventeen were first admitted into evidence, and (3) the summary document did not adequately identify to which documents in exhibit seventeen each summarized expenditure related, and, therefore, the admission of the summary document would amount to allowing the plaintiff to "[throw] a wad of stuff against the wall and [say], well, it's somewhere in there," thus unfairly prejudicing the town's ability to cross-examine the plaintiff regarding its capital expenditures.

The court overruled the town's objection that the plaintiff was required to establish that exhibit sixteen itself constituted a business record, observing that the plaintiff did not offer it as such but rather offered it as a summary pursuant to § 10-5 of the Connecticut Code of Evidence. The court also disagreed with the town that exhibit seventeen had to be introduced into evidence in order for exhibit sixteen to be admissible pursuant to § 10-5 of the Connecticut Code of Evidence, which does not require that the "voluminous," summarized documents be introduced into evidence, but only that they be "otherwise admissible." Conn. Code Evid. § 10-5. See footnote 17 of this opinion. The court agreed, however, with the town's third concern and stated that the town

"ought to be able to challenge the entries on the summary exhibit without being forced to go through the whole [of exhibit seventeen] looking for the backup documentation." The primary problem with exhibit sixteen, in the court's view, was that, despite the court's previous order during the trial management conference requiring the plaintiff to Bates-stamp[19] the documents comprising exhibit seventeen, the plaintiff had neglected to incorporate any references to the Bates-stamp numbers in exhibit sixteen. That omission, the court observed, defeated the purpose of the Bates-stamp numbers. Accordingly, the court ordered the plaintiff to modify exhibit sixteen to incorporate references to the Bates-stamp numbers in exhibit seventeen. The court also ruled that, in order to establish the admissibility of exhibit sixteen pursuant to §10-5 of the Connecticut Code of Evidence, the plaintiff would be required to prove that exhibit seventeen was admissible. The court further clarified that, if it admitted exhibit sixteen into evidence, it would exercise its discretion to admit it solely as a demonstrative aid to the court, not as substantive evidence.

The plaintiff then questioned Briggs in order to establish the admissibility of exhibit seventeen. After Briggs was given an opportunity to examine the documents comprising the exhibit, he testified that they were copies of the plaintiff's records pertaining to the capital improvements made to the property between the tax year of October 1, 2008, and March, 2015. Briggs then testified that he had been involved in preparing the physical box that contained the copies, which were subsequently provided to the town by the plaintiff's attorney.

With respect to exhibit sixteen, Briggs admitted that his attorneys created the summary. He also testified, however, that he and the plaintiff's bookkeeper,

---

[19]A Bates stamp is "[a] self-advancing stamp machine used for affixing an identifying mark, [usually] a number, to a document or to the individual pages of a document." Black's Law Dictionary (9th Ed. 2009) p. 172. To Bates-stamp is "[t]o affix a mark, [usually] a number, to a document or to the individual pages of a document for the purpose of identifying and distinguishing it in a series of documents." Id.

Margaret Gledhill, reviewed every entry in exhibit sixteen, as well as the corresponding invoices, and made changes to the summary based on their review. With those corrections, he testified, exhibit sixteen was a true and accurate summary of the records contained in exhibit seventeen. On the basis of the plaintiff's proffer, the court admitted both exhibits sixteen and seventeen, with the understanding that the plaintiff was required to modify exhibit sixteen to add references to the Bates-stamp numbers from exhibit seventeen. The plaintiff presented the substitute exhibit sixteen two days later, incorporating the modifications as ordered by the court.

"[A] trial court's evidentiary rulings . . . will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. . . . In reviewing claims that the trial court abused its discretion, great weight is given to the trial court's decision and every reasonable presumption is given in favor of its correctness. . . . We will reverse the trial court's ruling only if it could not reasonably conclude as it did." (Internal quotation marks omitted.) *Customers Bank* v. *Tomonto Industries, LLC*, 156 Conn. App. 441, 444, 112 A.3d 853 (2015). "To the extent [that] a trial court's admission of evidence is based on an interpretation of the [Connecticut] Code of Evidence, our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review. . . . We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion." (Internal quotation marks omitted.) Id., 445.

## A

We begin with the town's two challenges to the admission of exhibit seventeen into evidence. First, the town claims that the court abused its discretion in admitting exhibit seventeen under the business records exception to the hearsay rule. The town contends that, because the

plaintiff failed to demonstrate that Briggs or any other witness had the requisite knowledge to testify that all of the documents in exhibit seventeen were created in the regular course of business or that it was the regular course of business to make these records contemporaneously with the "act, transaction, occurrence or event" that the documents purport to record, exhibit seventeen is hearsay to which no exception applies, rendering both exhibits sixteen and seventeen inadmissible. Specifically, the town argues that, because Briggs was not asked to examine all 1327 pages in authenticating exhibit seventeen, he lacked the requisite knowledge to testify that the exhibit constituted a business record pursuant to General Statutes § 52-180.[20] Therefore, the town claims, he could not authenticate the exhibit as a business record pursuant to § 52-180. We conclude that the court did not abuse its discretion in ruling that the plaintiff established that the documents in exhibit seventeen constituted business records.

"Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. . . . If the proffered evidence consists of business records, the court must determine whether the documents satisfy the modest

[20] General Statutes § 52-180 provides in relevant part: "(a) Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of the act, transaction, occurrence or event, if the trial judge finds that it was made in the regular course of any business, and that it was the regular course of the business to make the writing or record at the time of the act, transaction, occurrence or event or within a reasonable time thereafter.

"(b) The writing or record shall not be rendered inadmissible by (1) a party's failure to produce as witnesses the person or persons who made the writing or record, or who have personal knowledge of the act, transaction, occurrence or event recorded or (2) the party's failure to show that such persons are unavailable as witnesses. Either of such facts and all other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect the weight of the evidence, but not to affect its admissibility. . . ."

The business records exception to the hearsay rule was incorporated "verbatim" in § 8-4 of the Connecticut Code of Evidence. E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 8.25.2, p. 590. For simplicity, we refer in this opinion solely to § 52-180.

requirements under . . . § 52-180 to admit them under the business records exception to the hearsay rule. . . . The court must determine, before concluding that it is admissible, [1] that the record was made in the regular course of business, [2] that it was the regular course of such business to make such a record, and [3] that it was made at the time of the act described in the report, or within a reasonable time thereafter. . . . In applying the business records exception, the statute . . . should be liberally interpreted. . . . In part, this is because the statute recognizes the inherent trustworthiness of documents created for business rather than litigation purposes. . . . [Our Supreme Court] repeatedly has held that [i]t is not necessary . . . that the witness have been the entrant himself or in the employ of the business when the entry was made. . . . It is sufficient for a witness to testify that it was the regular business practice to create a document within a reasonable time after the occurrence of the event. This is sufficient to ensure that the document was created at the time when the event was fresh in the author's mind. . . . To require the defendant to produce a witness that could testify from personal knowledge as to the specific time that a particular document was made would unduly constrain the use of the business records exception and directly contradict the liberal interpretation that this court has accorded to § 52-180." (Footnote omitted; internal quotation marks omitted.) *State* v. *Dunbar*, 233 Conn. App. 297, 315–17, 339 A.3d 642, cert. denied, 353 Conn. 913, 344 A.3d 155 (2025).

The plaintiff presented sufficient evidence to demonstrate that Briggs had the requisite knowledge to attest to the status of the records in exhibit seventeen as business records. The plaintiff elicited testimony from Briggs that he assisted in preparing the records, and that when he reviewed the summary document prepared by his attorneys, he not only reviewed each entry in the summary document, but also the corresponding invoices summarized by each entry. Moreover, during trial, counsel requested that Briggs examine the documents in court before testifying as to their status as business records.

In light of the "'modest'" requirements of §52-180; id., 316; Briggs' testimony established that he had the requisite knowledge to establish that the documents constituted business records. See, e.g., *Customers Bank* v. *Tomonto Industries, LLC*, supra, 156 Conn. App. 450 ("[i]t is generally held that business records may be authenticated by the testimony of one familiar with the books of the concern, such as a custodian or supervisor, who has not made the record or seen it made, that the offered writing is actually part of the records of business" (internal quotation marks omitted)).

The town's second challenge to the admission of exhibit seventeen stems from the sheer size of the exhibit. Specifically, the town claims that the admission of exhibit seventeen unfairly prejudiced the town by rendering it impossible to raise challenges as to each individual record in the exhibit, both as to the individual record's status as a business record and as relevant to the plaintiff's claim that it met the capital expenditures requirement of the agreement. To the contrary, we conclude that the record reveals that the court took appropriate measures to mitigate any prejudice experienced by the town.

As we have explained, the court was aware of the town's concerns about its ability to cross-examine the plaintiff regarding the expenses evidenced in exhibits sixteen and seventeen. The court shared those concerns, initially expressing dissatisfaction with the manner in which the plaintiff had organized the documents in exhibit seventeen, describing those documents as having been "[thrown] . . . all in there." The court emphasized several times during a colloquy with the parties that it was keen to avoid having to "fish" through exhibit seventeen in order to verify the summary data in exhibit sixteen. To address that problem, during the trial management conference, the court had ordered the plaintiff to Bates-stamp the documents in exhibit seventeen. When the plaintiff proffered exhibit sixteen, the court made clear that the absence of any references in exhibit sixteen to the Bates-stamp numbers added to exhibit seventeen caused

the court to question whether the summary exhibit would be at all helpful to the court. If exhibit sixteen did not incorporate references to the Bates-stamp numbers in exhibit seventeen, the court asked, "[W]hat's the point in having the [Bates-stamp] numbers?" The court explained that its order to the plaintiff directing it to incorporate references to the Bates-stamp numbers in exhibit sixteen was intended to address both its concerns and those of the town.

The court's order, which ensured that the town would be able to use the Bates-stamp references in exhibit sixteen to access the corresponding records in exhibit seventeen, reasonably addressed the town's concern that it would suffer undue prejudice by having to find the relevant document among the 1327 pages of records in exhibit seventeen. As the court explained, the cross references would ensure that each entry in exhibit sixteen could be correlated to the supporting documentation in exhibit seventeen. Indeed, the town fails to cite a single instance in which it attempted to cross-examine a witness regarding an entry in exhibit sixteen but was unable to locate the corresponding documentation in exhibit seventeen. Given this record, we conclude that the town has not satisfied its burden to demonstrate that the court erred in determining that the addition of Bates-stamp references to exhibit sixteen addressed any potential prejudice suffered by the town. See *State* v. *Papineau*, 182 Conn. App. 756, 771–72, 190 A.3d 913 ("In Connecticut, our appellate courts do not presume error on the part of the trial court. . . . Rather, the burden rests with the appellant to demonstrate reversible error." (Internal quotation marks omitted.)), cert. denied, 330 Conn. 916, 193 A.3d 1212 (2018).

### B

The town next claims that, because the plaintiff failed to demonstrate that the originals or copies of the documents in exhibit seventeen were "provided . . . for examination or copying, or both," as required by § 10-5 of the

Connecticut Code of Evidence, the court improperly admitted exhibit sixteen into evidence. We disagree.

The record reflects the following relevant procedural background. As we have noted, the town's primary concern regarding exhibits sixteen and seventeen was the potential difficulty it could encounter in cross-examining the plaintiff's witnesses regarding the individual documents. Related to that concern, the town alleged that it had no way of knowing that the documents that were purported to be summarized in exhibit sixteen were included in exhibit seventeen. The court observed that the town had obtained the contents of exhibit seventeen through discovery approximately five years before the start of trial. The town disagreed, stating that it had received "only parts" of the exhibit as long as five years prior to trial. The court responded that the town nonetheless had received exhibit seventeen an unspecified number of "years" before trial, and the town did not dispute the court's modified statement, nor did the town claim that it lacked a copy of the exhibit at the time of trial.

Section 10-5 of the Connecticut Code of Evidence provides that, in order for a summary of voluminous writings, recordings, or photographs to be admissible, the "originals or copies" must be "available upon request for examination or copying, or both, by other parties at a reasonable time and place." The record in the present case demonstrates that the plaintiff provided the town with a copy of exhibit seventeen sufficiently prior to trial, thus satisfying this requirement.

## V

We next address the town's claim that the trial court improperly failed to award the town interest for the 2015 tax year. The town argues that the imposition of interest on the plaintiff's delinquent taxes was not discretionary and the court improperly failed to award it. The plaintiff responds that the court properly did not award the town interest, contending that, because the town withdrew its counterclaim seeking interest prior to trial, then raised

this issue only in a motion for reargument after the court had rendered judgment, the town abandoned the claim. We agree with the plaintiff.

The following additional factual and procedural background is relevant to our resolution of this claim. The court found that, after the town had cancelled the agreement, "[o]n July 5, 2016, [it] issued a 'real estate assessment change notice' that retroactively removed the tax abatements back to the 2009 grand list and calculated additional taxes owed by the plaintiff for each of the years covered by the . . . agreement. The total amount of supplemental tax calculated by the [town] was $378,717.02. The plaintiff has not paid these additional taxes levied by the [town]." (Footnote omitted.) In the present action, on April 30, 2019, the town filed a counterclaim, alleging, inter alia, that, "[p]ursuant to [General Statutes] § 12-146, [it was] entitled to collect 18 . . . percent interest on the delinquent taxes that remain unpaid by the [plaintiff], retroactive to the due date thereof." At the conclusion of trial, however, the town withdrew its counterclaim, which the court expressly noted in its memorandum of decision.

After the court issued its memorandum of decision, the town filed a motion to reargue, contending, among other things, that the court's finding that the town was entitled to reassess the plaintiff's taxes for the tax year of 2015 required the court to award the town interest on the delinquent taxes dating back to August 6, 2016, the date on which the plaintiff's payment became delinquent. Specifically, the town relied on paragraph 6 of the agreement, which provides: "In the event of cancellation by the [t]own for any reason under this [a]greement, the [p]roperty will be reassessed by the [t]own [a]ssessor effective with the [g]rand [l]ist immediately prior to the event for which the cancellation is made. The tax levy against the [p]roperty, based upon that reassessment, will be adjusted and, where appropriate, [the town] will send a revised or adjusted real estate tax bill, due and owing in the time and manner

required by law." The town alleged that, with respect to the plaintiff's tax bill for the October, 2014 grand list year, "[a]cting pursuant to the agreement, the [town assessor] assigned a total market value of $6,874,300 for [the property]. The taxes levied against 70 [percent] of that value, $4,795,470, were $60,887.24, and were due and payable no later than August 6, 2016, in accordance with law." The town argued that, because the plaintiff failed to pay the reassessed taxes due on the property, §12-146[21]—which provides in relevant part that "the delinquent portion of the principal of any tax shall be subject to interest at the rate of [18 percent] per annum from the time when it became due and payable until the same is paid"—required the court, in the absence of any request of such relief by the town, to award it interest on the delinquent taxes. In its objection to the motion for reargument, the plaintiff argued that, because the town had withdrawn its counterclaim seeking interest on the delinquent taxes and failed to raise the issue in its posttrial briefs, (1) the issue was not properly before the court, and (2) the town had abandoned the claim. Additionally, the plaintiff argued that, because the town assessor never sent a reassessment based solely on the October, 2014 grand list year and instead sent a single tax bill for all the years covered by the agreement, the town never made a proper demand for payment of the

---

[21] General Statutes §12-146 provides in relevant part: "Unless the context otherwise requires, wherever used in this section, 'tax' includes each property tax and each installment and part thereof due to a municipality as it may have been increased by interest, fees and charges. If any tax due in a single installment or if any installment of any tax due in two or more installments is not paid in full (1) on or before the first day of the month next succeeding the month in which it became due and payable, or if not due and payable on the first day of the month, (2) on or before the same date of the next succeeding month corresponding to that of the month on which it became due and payable, the whole or such part of such installment as is unpaid shall thereupon be delinquent and shall be subject to interest from the due date of such delinquent installment. . . . [T]he delinquent portion of the principal of any tax shall be subject to interest at the rate of [18 percent] per annum from the time when it became due and payable until the same is paid . . . ."

taxes due on the 2014 grand list, and, therefore, § 12-146 did not apply.

In its order on the motion for reargument, the court denied the town's request for an award of interest, stating: "There is no claim before the court for interest on taxes due with respect to the October 1, 2014 assessment and the 2015 tax year. Nor was the issue raised at any time until the present motion to reargue."

On appeal, the town argues that the court was required to award it interest, despite its withdrawal of its counterclaim requesting an award of interest, because the court's imposition of interest is not discretionary.[22] The plaintiff relies on the town's withdrawal of its counterclaim and its failure to brief the issue in its posttrial briefs to argue that the court properly denied reargument on the town's claim for interest. We agree with the plaintiff.

We begin with the standard of review and relevant legal principles. "[I]n reviewing a court's ruling on a motion to open, reargue, vacate or reconsider, we ask only whether the court acted unreasonably or in clear abuse of its discretion. . . . When reviewing a decision for an abuse of discretion, every reasonable presumption should be given in favor of its correctness. . . . As with any discretionary action of the trial court . . . the ultimate [question for appellate review] is whether the trial court could have reasonably concluded as it did. . . . [T]he purpose of a reargument is . . . to demonstrate to the court that there is some decision or some principle of law which would have a controlling effect, and which has been overlooked, or that there has been a misapprehension of facts. . . . It also may be used to address . . . claims of law that the [movant] claimed were not addressed by the court. . . . [A] motion to reargue [however] is not to be used as an opportunity to have a second bite

---

[22] On appeal, the town relies on General Statutes § 12-145, rather than § 12-146, to support its claim for interest. In light of our conclusion that the court properly denied reargument on the town's claim for interest as a result of its withdrawal of its counterclaim and its failure to brief the issue in its posttrial briefs, we need not discuss this discrepancy further.

of the apple . . . .” (Internal quotation marks omitted.) *Prioleau* v. *Agosta*, 232 Conn. App. 94, 101–102, 335 A.3d 93 (2025).

“In general, a court’s decision is restricted to those issues raised by the parties in their pleadings and in argument. [P]leadings have their place in our system of jurisprudence. While they are not held to the strict and artificial standard that once prevailed, we still cling to the belief, even in these iconoclastic days, that no orderly administration of justice is possible without them. . . . It is fundamental in our law that the right of a [party] to recover is limited to the allegations in his [pleading]. . . . Facts found but not averred cannot be made the basis for a recovery. . . . Thus, it is clear that [t]he court is not permitted to decide issues outside of those raised in the pleadings. . . . It is equally clear, however, that the court must decide those issues raised in the pleadings.” (Internal quotation marks omitted.) *Swain* v. *Swain*, 213 Conn. App. 411, 418–19, 277 A.3d 895 (2022).

Moreover, this court repeatedly has stated that “[a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . Where a claim receives only cursory attention in the brief without substantive discussion, it is deemed to be abandoned.” (Internal quotation marks omitted.) *Guiliano* v. *Jefferson Radiology, P.C.*, 206 Conn. App. 603, 625, 261 A.3d 140 (2021); see also *Billboards Divinity, LLC* v. *Commissioner of Transportation*, 133 Conn. App. 405, 412, 35 A.3d 395 (same), cert. denied, 304 Conn. 916, 40 A.3d 783 (2012).

The town’s withdrawal of its counterclaim, coupled with its failure to argue in its posttrial briefs that it was entitled to interest, would have rendered it improper for the court to grant the town’s request in its motion for reargument for interest on the delinquent tax. Once the town withdrew its counterclaim at the close of trial, the town no longer had a claim pending before the court seeking interest. By subsequently failing to brief the claim for interest in its posttrial briefs, the town abandoned

that claim. See *Guiliano* v. *Jefferson Radiology, P.C.*, supra, 206 Conn. App. 625. The court properly declined to allow the town to revisit its strategic choices in the context of a motion to reargue. See *Prioleau* v. *Agosta*, supra, 232 Conn. App. 102 (motion to reargue is not opportunity for second bite of apple).

## VI

In its cross appeal, the plaintiff claims that the trial court improperly rejected its appeal of the town's reassessment of the property for the October 1, 2014 grand list year pursuant to § 12-119. The plaintiff argues that, by retroactively imposing the taxes on the property for the entire seven years covered by the agreement after the 2014 grand list tax bills would have been due, the town deprived the plaintiff of the opportunity to timely appeal from the imposition of additional—and, according to the plaintiff, manifestly excessive—taxes for the 2015 tax year, the sole tax year as to which the court held the town was entitled to reassess the property. The town responds that the court properly rejected the plaintiff's appeal on the basis that it failed to establish that the town arrived at its valuation of the property by disregarding the provisions of the statutes for determining the valuation of the property. We conclude that the court properly rejected the plaintiff's claim.

The following additional factual and procedural background is relevant to our resolution of this issue. As we have detailed earlier in this opinion, the town issued the notice of reassessment on July 5, 2016. The first page of the reassessment notice informed the plaintiff that, pursuant to General Statutes (Rev. to 2015) § 12-111, the plaintiff was required to file a written request for an appeal hearing on or before February 20, 2017, with the town's board of assessment appeals. Rather than appealing to the board of assessment appeals, the plaintiff amended the complaint in this already ongoing action to incorporate its claims challenging the town's

reassessment of the property for the tax years covered by the agreement pursuant to §12-119.[23]

In its memorandum of decision, the court considered the town's assessment of the property in light of the expert testimony presented by both the town and the plaintiff as to the market value of the property as of October 1, 2013.[24] The court summarized as follows: "For the 2013 grand list, the [town] valued 322 Main Street at $6,723,100 and 322A Main Street at $151,200 for a total market value of $6,874,300. . . . The assessed values were 70 percent of these amounts. The [town's] appraiser, Robert Silverstein, has opined that the total market [value was] $6,706,400 as of October 1, 2013 . . . . The plaintiff's appraiser, Arnold Grant, valued the two parcels together at $3,830,000 as of October 1, 2013 . . . ." (Footnote omitted.)

In its factual findings, the court discussed at length the methodology on which both appraisers relied. Silverstein and Grant, the court noted, each relied on a comparable sales approach and an income capitalization approach to valuate the property, and they agreed that the property is "unique and thus more difficult to appraise." Based on their testimony, the court found that "the property includes a series of mill buildings all built in the nineteenth century, except for a loading dock built in 1998. The buildings are in various stages of redevelopment. Some space is finished and rented to commercial tenants. In 2012, the plaintiff obtained approval of a zone change permitting it to develop 40 percent of the overall space as residential, presumably as apartments. No residential development has yet occurred on the property.

---

[23] The plaintiff also relied on §12-119 to challenge the town's October 1, 2015 assessment of the property, a claim that the court rejected. The court's finding that the plaintiff was entitled to relief with respect to the October 1, 2015 assessment pursuant to §12-117a, however, renders that denial immaterial.

[24] Both experts also testified regarding the proper valuation of the property as of 2018. Because only the 2013 valuation of the property is relevant to the issue in the plaintiff's cross appeal, we confine our discussion to the evidence presented regarding the property's 2013 market value.

Some undeveloped space has been gutted and prepared for buildout that has not yet occurred, while other space still needs complete renovation. Still other space is in such disrepair it may have to be demolished. There is not precise agreement on how many square feet of space the buildings have, nor is there agreement on whether partially underground space should be considered in the appraisals. The difference in overall space is approximately 11,000 square feet (280,000–269,000). More significantly, there is approximately 44,000 square feet of space that is below grade on the front side of the buildings, but above grade in the rear. Grant did not include this space in either of his appraisal methods whereas Silverstein did. The court finds that the below grade space should be considered as usable space that may not be as valuable as the above grade space but has already demonstrated that it does have value. It has been used by tenants in the past, including tenants present during the plaintiff's ownership of the property.

"According to Grant, approximately one half of the usable space (112,000 square feet) is commercial but, accounting for the buildings' thick walls, wide hallways, and other common areas not included in the existing leases, the rentable commercial space is 100,000 square feet. According to Silverstein's calculations, which include approximately 22,000 feet below grade, 139,000 square feet are completed and usable. Silverstein makes no reduction for the common areas. The potential residential square footage is 108,000 to 112,000 feet, depending on whose numbers are used. Eighty-one thousand square feet consists of 'shell space' ready to be built out, including approximately 14,000 square feet of space below grade. Sixty thousand square feet, including 9000 feet below grade, require complete renovation.

"A significant difference in the methodology employed by the two appraisers concerns the fact that approximately half the available space is developed for commercial use and the other half of the property, most of which is available for residential development, is undeveloped.

This factors principally in the comparable sales analysis employed by each appraiser. Grant . . . followed a more conventional methodology in the sense that he treated the property as a unified whole. He mainly considered sales of other former mills in various stages of development for both residential and commercial use and arrived at [a] market [value] of $3,020,000 [for 322 Main Street] in 2013 . . . . Silverstein, on the other hand, divided the property into two segments for purposes of the comparable sales analysis, developed space and undeveloped space. Silverstein looked at comparable sales for the developed commercial space and arrived at a market value for that space, and then separately evaluated comparable sales for the undeveloped space, available for potential residential development. He added the two results to arrive at [a] market [value] for 322 Main [Street] of $6,665,000 in 2013 . . . .

"Even the court can appreciate the difficulty these two experienced and reputable appraisers confronted when seeking to apply a comparable sales methodology to a half developed, partly rehabilitated, mixed-use Civil War era mill complex. Silverstein's approach has some conceptual appeal because it gets around the difficulty of fitting a round peg into a square hole. Otherwise, it does not reflect the real world in a compelling way. The value attributed to the developed commercial space under his approach is inflated, in the court's view, by comparing it to sales of commercial space to nonprofit entities and private investors who do not, as part of the bargain, also acquire an albatross of old, undeveloped mill buildings zoned for residential development. As Silverstein acknowledged, only a developer, not an investor or end user, would consider purchasing the subject property. Silverstein's reliance on sales of developed commercial space that is comparable in vintage and style, but sold in a much larger and more liquid market not limited to developers, skews the results of Silverstein's analysis upward. Grant's analysis, on the other hand, suffers from the dearth of truly comparable sales in the market, resulting in his application of significant adjustments to

those sales and reliance on a lower number of sales than is considered optimal. The court reconciles the differences in these approaches in similar fashion to the way appraisers often reconcile their own results produced by different methodologies—by averaging them. Thus, based on a comparable sales approach, the court concludes the market value of 322 Main [Street] was $4,842,500 in 2013 and $4,892,500 in 2018.

"The two appraisers took different approaches to the income capitalization methodology as well; although they used nearly identical capitalization rates. Grant considered only the rentable commercial space and based his analysis on actual rental income. He offered no analysis of market rent other than to say that he believed the actual rents were close to market. His income capitalization analysis was based strictly on actual income and, therefore, he made no adjustments for vacancy rate and credit loss. Grant assigned no contributory value to the undeveloped space because that space has not generated any income and has not been developed. Grant's approach produced volatile results based on transitory circumstances. His income analysis produced radically different conclusions, from $4.1 million in 2013 to $1.65 million in 2018, a 60 percent drop largely attributable to the loss of a significant tenant in 2017.

"Silverstein's income capitalization values were more consistent at $5.6 million in 2013 and $4.7 million in 2018, a 16 percent drop that also reflected a higher occupancy rate than Grant recognized, and Silverstein included square footage partially below grade in his analysis. The court finds that Silverstein's analysis is more reliable to the extent that it is based on a more accurate consideration of the available space and applies a realistic vacancy rate to the net rentable area. Grant concluded the net rentable area varied from year to year from a low of 78,728 square feet in 2018, to a high of 98,428 square feet in 2017. Silverstein used a figure of 114,992 square feet consistently. The court finds, however, that his figure should be reduced based upon the unique size and

nature of the common area space that cannot be rented (10,000 square feet). Accordingly, the court adjusts Silverstein's calculation of effective gross income for 2013 to $1,137,850.80 (104,992 ft. × $12.75 × 0.85 occupancy) and, for 2018, to $1,044,145.44 (104,992 ft. × $12.75 × 0.78 occupancy). This results in values, not including any value attributed to the shell space, of $4,744,000 in 2013, and $4,032,500 in 2018.

"The court does not concur with Silverstein's addition of contributory value for the shell space to his income capitalization analysis utilizing his conclusions concerning the value of that space under a comparable sales approach. Rather than combining these two methodologies into a hybrid model, as Silverstein has done, the court considers each methodology as a check on the other. The court arrives at market values for 322 Main [Street] by combining its conclusion as to the comparable sales values with Silverstein's income capitalization values, as adjusted above and not including the addition of contributory value for the undeveloped shell space. Because, however, the income capitalization approach does not attribute any value to the undeveloped space, the court assigns greater weight to the comparable sales analysis than it does to the income capitalization approach. The court applies one-third weight to the income capitalization approach and two-thirds weight to the comparable sales approach, which reflects the fact that approximately one-half of the space is undeveloped and, therefore, the income capitalization approach deserves only half the weight afforded to the comparable sales approach. Accordingly, the court concludes that the market value of the property was $4,810,000 in 2013 . . . . Further, the court finds the value of 322A Main [Street] was [$6400] in both 2013 and 2018, the value Silverstein attributed to the plaintiff's interest in that parcel." (Footnotes omitted.)

In considering the plaintiff's challenge to the town's July, 2016 reassessment of the property pursuant to §12-119, the court began by recognizing that the

plaintiff's claim was limited to those tax years as to which the court had found that the plaintiff was in breach of the agreement. Thus, the court concluded that only the grand list assessment for October 1, 2014, which was based on the town's 2013 valuation of the property, was implicated. The court acknowledged that it had found that the town overvalued the property but emphasized that, in order to prevail in an action brought pursuant to § 12-119, the plaintiff was required to establish more than mere overvaluation. That is, under § 12-119, the plaintiff was required to prove that the town's assessment was "arbitrary and so excessive or discriminatory as in itself to show a disregard of duty" on the part of the town. In concluding that the plaintiff had failed to make that showing, the court noted that the town's estimate of the property's 2013 fair market value was less than Silverstein's, "but not by a wide margin." On a related point, the court considered it significant that Grant testified that he held Silverstein's capabilities as an appraiser in high regard. Finally, the court relied on a point agreed upon by both Grant and Silverstein, namely, that the property is a challenging one to value. Applying the legal standard to these facts, the court concluded that the plaintiff had failed to prove that the town's valuation was "manifestly excessive" pursuant to § 12-119.

We begin with the applicable standard of review. "In concluding that the [plaintiff] failed to establish that the assessment was manifestly excessive under § 12-119, the court drew legal conclusions on the basis of its interpretation of appellate case law and provisions of the General Statutes. Therefore, our review is plenary." *Wysocki* v. *Ellington*, 109 Conn. App. 287, 295, 951 A.2d 598, cert. denied, 289 Conn. 934, 958 A.2d 1248 (2008).

"In a tax appeal taken pursuant to § 12-119, the plaintiff must prove that the assessment was (a) manifestly excessive *and* (b) . . . could not have been arrived at except by disregarding the provisions of the statutes for determining the valuation of the property. . . . [The plaintiff]

must [set forth] allegations beyond the mere claim that the assessor overvalued the property. [The] plaintiff . . . must satisfy the trier that [a] far more exacting test has been met: either there was misfeasance or nonfeasance by the taxing authorities, or the assessment was arbitrary or so excessive or discriminatory as in itself to show a disregard of duty on their part. . . . Only if the plaintiff is able to meet this exacting test by establishing that the action of the assessors would result in illegality can the plaintiff prevail in an action under §12-119. The focus of §12-119 is whether the assessment is illegal. . . . The statute applies *only* to an assessment that establishes a disregard of duty by the assessors." (Emphasis in original; internal quotation marks omitted.) *Walgreen Eastern Co.* v. *West Hartford*, 329 Conn. 484, 513, 187 A.3d 388 (2018). "Put differently, tax relief under §12-119 is available only in an extraordinary situation." (Internal quotation marks omitted.) *Tuohy* v. *Groton*, 331 Conn. 745, 760, 207 A.3d 1031 (2019).

The court's factual findings aptly demonstrate the complexity of assessing this particular property for purposes of valuation. The two appraisers arrived at different conclusions regarding the overall space, diverged as to whether to account for space that is below grade on the front side of the buildings but above grade in the rear, treated the common areas differently, gave different effect to the fact that one half of the property is developed for commercial use while the other half, mostly designated for residential use, is undeveloped, and relied on different assumptions for calculating rental income. And both experts agreed that this property is unique and presents a challenging one to appraise. It is true that the difference between the town's assessment of the property's value of $6,874,300 and the court's determination of the fair market value as $4,816,400 is more than $2 million. That difference, however, must be understood in the context of the court's findings regarding the difficulties presented in appraising the property. Viewed in that context, the plaintiff has demonstrated only that the town overvalued the property, a showing that the court

properly concluded was insufficient to satisfy its burden to prove a wrongful assessment pursuant to §12-119.[25]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[25] We find the plaintiff's arguments to the contrary unpersuasive. The plaintiff asserts that, because the town reassessed the property retroactively in July, 2016, for the years covered by the agreement, the plaintiff was prevented from filing a timely appeal pursuant to § 12-117a. Other than making that conclusory assertion, the plaintiff provides no explanation as to how the town's retroactive imposition of the additional taxes prevented it from appealing to the town's board of assessment appeals, which is the required avenue of appeal pursuant to § 12-117a. The plaintiff concedes that, rather than seeking a hearing with the town's board of assessment appeals, it amended its complaint in the present case.

As we have noted in this opinion, the July 5, 2016 reassessment notice issued by the town informed the plaintiff that it had until February 20, 2017, to seek an appeal hearing before the town board of assessment appeals. That notice also informed the plaintiff that the board of assessment appeals would be meeting in March, 2017. If the plaintiff had requested and received a hearing, and was aggrieved by the action of the board, it would then have been entitled to appeal "within two months from the date of the mailing of notice of such action . . . in the nature of an appeal therefrom . . . to the superior court for the judicial district in which such town or city is situated . . . ." General Statutes (Rev. to 2015) § 12-117a. The plaintiff failed to make any such request.

The plaintiff also argues that, because the town exceeded the scope of its available remedy, reassessing the property for all years covered by the agreement rather than solely reassessing the property for the 2015 tax year, the town's reassessment was illegal. This argument has no merit.